IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DUBUQUE DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.                               No. CR22-1002-LTS

MATTHEW DANIEL BIRCH,             TRANSCRIPT OF
                                       DETENTION HEARING
        Defendant.

_____/

        The Detention Hearing held before the Honorable
Mark A. Roberts, Magistrate Judge of the United States
District Court for the Northern District of Iowa, at the
Federal Courthouse, 111 Seventh Avenue Southeast, Cedar
Rapids, Iowa, March 30, 2022, commencing at 12:58 p.m.

APPEARANCES

For the Plaintiff:    DEVRA HAKE, ESQ.
                        Assistant United States Attorney
                        111 Seventh Avenue Southeast
                        Cedar Rapids, IA 52401

For the Defendant:    ANDREA D. JAEGER, ESQ.
                        Keegan, Tindal & Jaeger
                        Suite 140S
                        2322 East Kimberly Road
                        Davenport, IA  52807

Also present:         Zach Ward, U.S. Probation

Transcribed from     Shelly Semmler, RDR, CRR
digital recording by: 320 Sixth Street
                        Sioux City, IA  51101
                        (712) 233-3846

Case 2:22-cr-01002-LTS-MAR  Document 20  Filed 04/14/22  Page 1 of 56

```
1        (The following transcript was prepared from an audio
2   recording.)
3                              * * * *
4        THE COURT:  Please be seated.  The matter now
5   before the Court is United States of America versus
6   Matthew Daniel Birch, Number 22-CR-1002.  United States
7   is represented by Assistant United States Attorney Devra
8   Hake.  The defendant is here in person with his attorney,
9   Andrea Jaeger.  The matter comes on for a detention
10  hearing.
11       Is the government ready to proceed?
12       MS. HAKE:  Yes, Your Honor.
13       THE COURT:  Is the defense ready to proceed?
14       MS. JAEGER:  Yes, Your Honor.
15       THE COURT:  The government does have the
16  burden.  And you may proceed, Ms. Hake.
17       MS. HAKE:  Thank you, Your Honor.  First, the
18  government would proffer the pretrial services report
19  filed at docket 14 in this case.
20       THE COURT:  Any objection?
21       MS. JAEGER:  No objection.
22       THE COURT:  I'll let the parties know that I
23  have reviewed it in detail and will take formal notice of
24  it at this time.
25       Any evidence or proffer you'd like to make,
```

*Contact Shelly Semmler at 712-233-3840 or ssemmlerreporting@gmail.com*
*Court produced computer-aided transcript*
Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 2 of 56

1  Ms. Hake?

2        MS. HAKE:  Yes.  The United States calls Adam

3  Williams.

4        THE COURT:  Mr. Williams, if you'll come

5  forward, please.

6        ADAM WILLIAMS, PLAINTIFF'S WITNESS, SWORN

7        THE COURT:  Please be seated.  And when you're

8  comfortable, if you could please adjust that microphone

9  so you talk right into it so we can hear you, and then

10 state and spell your name for us.

11       THE WITNESS:  My name is Adam, A-d-a-m,

12 Williams, W-i-l-l-i-a-m-s.

13       THE COURT:  Very good.

14    Ms. Hake.

15                   DIRECT EXAMINATION

16 BY MS. HAKE:

17 Q.   What is your occupation?

18 A.   I work for the Dubuque County Sheriff's Office.

19 I've been employed with them since January 2006.  While

20 at the sheriff's office, I've worked as a correctional

21 officer, road patrol deputy, for the last six years as an

22 investigator with the drug task force, and currently I'm

23 the sergeant and director of the drug task force.

24 Q.   And are you a case agent involved in the

25 investigation into Matthew Daniel Birch?

1  A.   Yes, I am.

2  Q.   In December of 2019, did Dubuque law enforcement

3  receive a report from someone who wanted to turn in a

4  black bag that was found along a bike path?

5  A.   Yes, we did.

6  Q.   What was in that bag?

7  A.   The citizen turned that over to law enforcement, and

8  inside the bag was just over an ounce of methamphetamine

9  along with drug paraphernalia.

10  Q.   Did the DCI lab confirm that the substance was, in

11  fact, methamphetamine?

12  A.   It did, yes.

13  Q.   Is that amount consistent with a drug-trafficking

14  quantity?

15  A.   It is.

16  Q.   How do you know?

17  A.   Typically in our area, somebody that's using

18  methamphetamine will purchase anywhere between a half a

19  gram to a gram at a time.  Sometimes they will go back

20  multiple times a day to their dealer, but due to the

21  highly addictive nature of meth, someone that's strictly

22  using methamphetamine is not going to have very large

23  amounts of meth on hand.  If they do, they have a

24  tendency to use everything that they have all at once

25  which can be a dangerous situation.  So typically they'll

Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com
Your Deposition Complete Transcript Resource
Case 2:22-cr-01002-LTS-MAR   Document 202   Filed 04/14/23   Page 4 of 56

1  buy the smaller amounts at a time and have that with

2  them.  Anything over certainly what's considered an

3  8-ball or 3.5 grams is what we see consistent with

4  somebody that's distributing methamphetamine as opposed

5  to just having it for personal use.

6  Q.    Did law enforcement review traffic cameras as part

7  of its investigation into this bag?

8  A.    Yes, we did.

9  Q.    And what did law enforcement discover?

10  A.    In the traffic cameras, they saw the defendant

11  placing the bag on the back of a black Chevy pickup truck

12  and then what seemed to be inadvertently leaving the bag

13  there while the defendant drove away.  The vehicle was

14  followed on traffic cameras to the area where the citizen

15  found it, and that bag is actually observed falling off

16  of that bumper and laying in the street until the citizen

17  comes across it and then turns it into law enforcement.

18  Q.    On January 31 of 2019, were you part of an operation

19  in which a confidential informant purchased

20  methamphetamine from the defendant?

21  A.    Yes, I was.

22  Q.    What happened?

23  A.    We followed our normal protocols when conducting a

24  controlled buy, so we would meet with the confidential

25  informant ahead of time, verify what the informant is

Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com
Case 2:22-cr-01002-LTS-MAR   Document 201   Filed 04/14/23   Page 5 of 56

telling us through text message logs, recorded phone

calls to the target.  Once that's done, the informant is

searched, given the preserialized currency to use for the

transaction, and provided with recording devices to use

during the buy.

     The informant would then be escorted to the area

where the buy would take place.  In this case it was on

Air Hill in Dubuque.  Once the informant was there, they

went into the residence, met with the defendant,

purchased some methamphetamine, approximately a half

ounce of methamphetamine, from the defendant.

     When they left the house, we again met with the

defendant, conducted a debrief -- I'm sorry, with the

informant, conducted a debrief, and followed the same

protocols as far as searching the informant and obtaining

the evidence from them.

Q.   The following month, in January of 2020, did law

enforcement meet with a confidential informant who said

that in Dubuque the defendant regularly supplies that

informant with methamphetamine to sell?

A.   Yes, we did.

Q.   And did that confidential informant say that the

defendant last sold half an ounce of methamphetamine to

the CI about January 13 of 2020?

A.   Yes.

1    Q.    On January 24 of 2020, did the defendant elude the

2    police?

3    A.    Yes.

4    Q.    What happened?

5    A.    Task force investigators observed the same Chevy

6    pickup down at a residence on Elm Street in Dubuque.

7    They began surveillance on the vehicle, observed the

8    defendant coming out of a residence and getting into that

9    vehicle and driving off.   They made arrangements with

10    marked patrol units to try a traffic stop on the

11    defendant.   Defendant took off at a high rate of speed

12    into a residential area, eventually stopped and fled on

13    foot from the vehicle.   With the use of a K-9, the

14    defendant was tracked to a place where he was located

15    hiding underneath a porch in that same area where the

16    vehicle was found.

17    Q.    On April 21, 2020, was the defendant arrested

18    because there was a warrant out for his arrest?

19    A.    Yes.

20    Q.    And did he consent to law enforcement searching his

21    person and also his motorcycle that was with him?

22    A.    Yes.

23    Q.    What did law enforcement find?

24    A.    Approximately $6,200 in cash on his person.   There

25    was meth residue in a pouch on the handlebars of the

Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com
Court Reporter - Official Transcript
Case 2:22-cr-01002-LTS-MAR Document 20 Filed 04/14/22 Page 7 of 56

1    motorcycle which did field test positive for

2    methamphetamine and multiple syringes in that same pouch.

3    Q.    Did law enforcement think that the cash that was

4    found come from a legitimate source?

5    A.    There's nothing that we could find to suggest that

6    that did come from a legitimate source.  During that same

7    time frame, we were getting multiple reports from

8    multiple different sources and informants who stated that

9    the defendant was heavily involved in the distribution of

10   methamphetamine, and we were not able to find any

11   legitimate source of income for that money.

12   Q.    Now talking about April 20 of 2021, did the

13   defendant again elude police?

14   A.    Yes.

15   Q.    How so?

16   A.    Defendant again was observed leaving a different

17   house that's known for drug activity driving a black Jeep

18   Wrangler.  It was followed by investigators to an area in

19   East Dubuque, Illinois, just across the river from

20   Dubuque.  Defendant was observed by one of our

21   investigators outside of that vehicle and then getting

22   back into the driver's seat.  Once the Jeep came across

23   the river into the Iowa side, investigators along with

24   myself began surveilling the vehicle and attempting a

25   traffic stop.

```
1    Eventually the officers did get in position to try a
2  stop on that Jeep.  The Jeep fled at a very high rate of
3  speed directly past an elementary school as well as busy
4  streets and at one point even drove up on the sidewalk
5  trying to evade law enforcement.  We eventually called
6  off the pursuit just for the risk of danger to the
7  defendant as well as the officers and the public.
8  Q.   On September 26, 2021, did law enforcement traffic
9  stop the defendant?
10 A.   Yes.
11 Q.   How did the defendant respond?
12 A.   He was -- deputies came across a vehicle that was
13 reported to be associated with the defendant, conducted a
14 traffic stop.  Defendant did stop.  At the time he told
15 the deputies that he was his twin brother, Jesse Birch.
16 The deputies attempted to verify tattoos so that they
17 could determine whether or not it was the defendant or
18 his brother Jesse.  At that point the defendant took off
19 again at a high rate of speed from the traffic stop, led
20 deputies on a pursuit through Dubuque and into Jackson
21 County before a deputy eventually went into the ditch on
22 a gravel road, and the pursuit was called off at that
23 point.
24 Q.   Why was the pursuit called off?
25 A.   Because the danger for the speeds on the gravel
```

road. Defendant was driving a large pickup truck, at that point was able to maneuver on the gravel roads better than the deputies were, and the dust that was kicked up from that truck created an unsafe condition for the deputies who attempted to continue following him at that point.

Q. Did you encounter the defendant on November 12 of 2021?

A. Yes, I did.

Q. What happened?

A. We conducted video surveillance on the defendant's residence in La Motte, Iowa. We observed the defendant leaving the residence and getting into the driver's seat of a gray Honda Civic and leaving the residence towards Dubuque so northbound through the town of La Motte. In the hopes of us being able to locate him on the highway, myself and another deputy or investigator drove down Highway 61 to try to find the defendant. We did pass the defendant just south of Dubuque in Dubuque County, followed defendant up to an area in Key West which is just south of Dubuque.

While attempting to organize deputies and officers to be in position for a traffic stop, we wanted multiple officers due to the history of the pursuits that the defendant was involved in as well as try to set up stop

1   sticks to end the pursuit as quickly as possible.

2       While we were making arrangements to get multiple

3   personnel into position, defendant pulled into a bank

4   parking lot and into the drive-through ATM lane of the

5   bank parking lot.  I then coordinated with a deputy who

6   was Sergeant Baney to come at the defendant's vehicle

7   from the front while I came in in my vehicle from behind.

8   We boxed in the Civic at that point in the drive-through

9   lane.  There wasn't -- there wasn't a whole lot of room.

10  The drive-through lane was basically one lane of traffic

11  and then led to a small or short-width grassy area where

12  there's a retaining wall.  So there wasn't a whole lot of

13  room on the other side of the vehicles for the Civic to

14  escape, and it couldn't go out the other side because of

15  the brick pillars that were holding up the ATM machine.

16      When I came in behind the defendant, he was

17  reversing at the time and reversed into my vehicle.  At

18  that point I observed him begin to move forward, and it

19  looked like he was attempting to drive around the squad

20  car that was in front of him, and that was in the same

21  area that Sergeant Baney was standing trying to give the

22  defendant orders to get out of the vehicle if the car had

23  continued where it had driven into the path of Sergeant

24  Baney, and Investigator Sitzmann was also on that side of

25  the vehicle, but he was kind of back towards the rear of

*Contact Shelly Semmler at 712-233-3846 or ssemmlerreporting@gmail.com*
*Reproduction without permission is prohibited by law.*
Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 11 of 56

1   the Civic.

2       So at that point I accelerated into the defendant's

3   vehicle and pushed him into the squad car pinning the car

4   in between the squad car and my undercover vehicle.  I

5   then approached -- got out of my vehicle and approached

6   the defendant's vehicle.  At that point I could still

7   hear the engine revving on his car which to me gave the

8   impression that he was still attempting to get out of

9   that situation.

10      The window was down at that point.  I was able to

11  deploy my taser into the defendant at which point he did

12  begin to cooperate with law enforcement, and we took him

13  into custody at that point.

14  Q.   Did law enforcement also search his car?

15  A.   Yes, we did.

16  Q.   And what did law enforcement find?

17  A.   Inside the car we found approximately 279 grams of

18  methamphetamine, $39,000 in cash.  We found a -- what

19  appeared to us to be a ledger listing names -- many of

20  the names that we recognized as individuals involved with

21  use or distribution of methamphetamine.  Next to those

22  names were dollar amounts that all added up totaled

23  around $30,000.

24  Q.   Did the DCI lab test the methamphetamine that was

25  found in the vehicle?

Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com
Reproduction of complete transcript prohibited
Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 12 of 56

```
 1   A.    Yes, they did.

 2   Q.    And did the lab confirm that it contained at least

 3   50 grams or more of actual pure methamphetamine?

 4   A.    Yes, they did.

 5   Q.    Has law enforcement received multiple reports from

 6   cooperators and confidential informants that the

 7   defendant is known to carry a firearm and would rather

 8   undergo suicide by cop than go to prison?

 9   A.    We did receive multiple reports of both defendant

10   being in possession of a handgun as well as an assault

11   rifle and that the defendant knew that he was looking at

12   potentially life in prison if arrested and that he would

13   commit suicide by cop as opposed to going to prison.

14           MS. HAKE:  I have nothing further for this

15   witness.

16           THE COURT:  Thank you, Ms. Hake.

17       Ms. Jaeger?

18           MS. JAEGER:  May I have a moment, Your Honor?

19           THE COURT:  Yes, you may.

20           MS. JAEGER:  Thank you, Your Honor.

21                       CROSS-EXAMINATION

22   BY MS. JAEGER:

23   Q.    Is it deputy or officer?

24   A.    Sergeant.

25   Q.    Sergeant, okay.  Thank you.  Sergeant, on just a
```

couple of the dates that we were talking about in your

testimony, so if we could go back and get clarification

on some of those, the first issue that you were

describing was the traffic cameras and a bag on the truck

that was turned in by the citizen?

A.    Yes.

Q.    What was the date of that?

A.    It was December of 2019.  I don't recall the exact

date, but it was December of 2019.

Q.    Okay.  And utilizing those traffic cameras, that is

where you saw or law enforcement saw what you believed to

be Mr. Birch placing the bag on the truck; is that right?

A.    Yes.

Q.    Did yourself or law enforcement observe Mr. Birch

carrying ice methamphetamine itself at any point on those

cameras?

A.    No.  It was a black object that was the exact same

size and description as the bag that was found.

Q.    Okay.  And yourself or other officers did not

observe Mr. Birch place ice methamphetamine into that

bag; is that correct?

A.    That's correct.

Q.    So the sum total is that Mr. Birch is alleged to

have been viewed placing the bag on the truck; is that

correct?

1  A.    And then the bag falling off the truck in the same
2  place that the citizen found it.
3  Q.    Right.  But in terms of what he's carrying, it's
4  just carrying the bag; is that right?
5  A.    Yes, that's correct.
6  Q.    Okay.  And you did not observe Mr. Birch ever dig
7  around in the bag or go inside the bag; is that correct?
8  A.    That's correct.
9  Q.    So no observation on those cameras to know that
10 Mr. Birch ever physically touched the methamphetamine or
11 knew that there was methamphetamine in that bag.  What
12 you can observe is that he's carrying a bag; is that
13 right?
14 A.    Yes, that's correct.
15 Q.    Okay.  Was that bag ever tested for fingerprints or
16 DNA?
17 A.    It was, yes.  The plastic bag inside of the outer
18 black bag was tested.
19 Q.    Did you locate either fingerprints or DNA results
20 for Mr. Birch?
21 A.    We didn't test DNA.  We checked for fingerprints.
22 There were no prints matching the defendant on the bags
23 inside of there.
24 Q.    Okay.  You also described the controlled buy?
25 A.    Yes.

Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com
to purchase a complete copy of the transcript.
Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 15 of 56

```
1   Q.    What was the date of that?
2   A.    December 31 of 2019, and I believe the bag incident
3   was December 8 of 2019.
4   Q.    All right.  And then you described talking with a
5   CI.  Is -- that CI who described for you a last sale, the
6   half ounce on January 13 of 2021, is that the same CI
7   that you're describing from the controlled buy or
8   somebody else?
9   A.    That's a -- I believe that was a different CI.  They
10  were working with one of our other investigators and not
11  me personally.
12  Q.    Okay.  So we're talking about two different people
13  those days.
14  A.    Yes.
15  Q.    Okay.  On each of those instances, the controlled
16  buy with individual 1 we'll call them on December 31 and
17  the CI that we'll call individual 2 from January 13,
18  those are both people who are drug users; right?
19  A.    The one from the controlled buy was for sure from my
20  knowledge of that person.  The second one, I -- I don't
21  know off the top of my hand the identity of that person
22  because we were receiving multiple reports from multiple
23  different people at that same time.  So I can't attest to
24  that person as far as their drug use.  But I can say that
25  that's -- that's the way that we encounter a lot of the
```

Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com
No purchase of complete copy of the transcript.
Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 16 of 56

```
 1   people that we encounter that we interview is they have
 2   some sort of connection to the drug world.  Otherwise
 3   they wouldn't know people that are selling drugs.
 4   Q.    And I guess that's my point is either way these are
 5   people who in order to have that kind of information are
 6   themselves involved in drugs; correct?
 7   A.    A lot of the times, yes.
 8   Q.    Either using, buying, or selling.
 9   A.    Yes.
10   Q.    And possession and selling and buying drugs are all
11   crimes; correct?
12   A.    Yes.
13   Q.    So these are people who are admitting to you that
14   they themselves are criminals; correct?
15   A.    Yes.
16   Q.    Would you agree with me that drug users are not
17   always the most reliable sources of historical
18   information?
19   A.    I would agree with that, and then we also take steps
20   to corroborate everything that the informant tells us so
21   that we're not relying solely on their credibility or
22   their testimony which is why we record the buys that we
23   do and provide them with body wires and instruments and
24   verify through text messages and surveillance.  So we do
25   take steps to -- I guess checks and balances on what the
```

*Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com*
Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 17 of 56
*Reproduction of complete copy of transcript*

```
 1   informant is telling us to see if we can verify that and
 2   not just somebody that has a grudge.
 3   Q.   So when you are receiving information from an
 4   informant, that is just information that they're telling
 5   you; correct?
 6   A.   Yes.  Like the second one you're --
 7   Q.   And then you take the additional steps that you just
 8   described.
 9   A.   Right.
10   Q.   Okay.
11   A.   And we also look at the other sources that are
12   providing the information.  If it -- if it seems possible
13   based on what other informants or other sources are
14   telling us, then we can corroborate those against each
15   other so we're not just relying on one person.
16   Q.   The reports that you described a minute ago about
17   carrying a firearm and would rather commit suicide by cop
18   than go to prison, is that something you're able to
19   corroborate?
20   A.   It came from different sources, so one source had
21   told us that actually back in 2020.  From 2020 a source
22   said that he was carrying a large knife and would commit
23   suicide by cop using the knife.  Then a different source
24   had said that he was carrying a handgun and carries a
25   handgun on him all the time and wanted to commit suicide
```

Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com
Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 18 of 56
reproduction in complete copy of the transcript.

by cop. And then a third source had said that about the
assault rifle and again that he believed that he was
going to spend the rest of his life in prison and didn't
want to do that and was going to die by cop instead.

Q. Each one of those three people that you just
described are someone telling that to law enforcement;
correct?

A. Yes.

Q. None of those three people are law enforcement.

A. That's correct.

Q. And none of those three conversations that are
alleged to have happened are recorded by law enforcement;
is that right?

A. It's documented after -- after the information came
in, the investigator that took the information would do a
report on it. But actual audio or video recording, to my
knowledge I don't think any of those were.

Q. That report, though, just says this person told me
such and such; correct?

A. Yes.

Q. That report does not say, "I heard Matt Birch say";
correct?

A. Yes, that's correct.

Q. And there is no audio or visual recording of Matt
Birch making those statements; is that correct?

Contact Shelly Semmler at 712-233-3840 or ssemmlerreporting@gmail.com
No purchase a complete copy of the transcript.
Case 2:22-cr-01002-LTS-MAR Document 20 Filed 04/14/22 Page 19 of 56

1   A.   Correct.

2   Q.   All right.  The incident on -- was it November 12 of

3   2021?  That's the last one?

4   A.   Yes.

5   Q.   Okay.  On that instance was there another individual

6   in the vehicle?

7   A.   Yes, there was.

8   Q.   Was there one passenger or more than one passenger?

9   A.   Just one.

10   Q.   In addition to Mr. Birch; right?

11   A.   Correct.

12   Q.   Okay.  Just to make sure I'm clear on that.  You

13   described finding -- was it $39,000 in cash?

14   A.   Just over 39,000, yes.

15   Q.   And then 279 grams of ice and a ledger with values

16   around 30,000; is that correct?

17   A.   Correct, yes.

18   Q.   Okay.  Were each of those three objects, the ice,

19   the cash, and the ledger, found on the passenger side or

20   the driver side?

21   A.   Little bit of both.  The money was found -- there

22   was quite a bit in the passenger door pocket.  I think

23   there was about $6,000 in the passenger's purse.  The

24   bulk of the money was found in a black backpack in the

25   backseat towards the driver's side, and we believe it's a

*Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com*
*to purchase a complete copy of the transcript.*
Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 20 of 56

      1   backpack the defendant was seen exiting the residence
      2   with when he got into the Civic prior to us stopping him.
      3   The methamphetamine was located in the center console,
      4   and between the center console and the passenger seat was
      5   a second bag.
      6   Q.   Okay.  None of those things were on Mr. Birch's
      7   person; is that correct?
      8   A.   Correct.
      9   Q.   And I think I heard you just say that there was a
     10   large chunk of money and perhaps some of the other
     11   objects in the purse carried by the passenger?
     12   A.   There was $6,000 and some meth residue that we
     13   scraped up that I think it was about .04 -- or .4 grams,
     14   0.4 grams in the purse.
     15   Q.   Was the ledger also in the purse?
     16   A.   No.  It was in a different bag in the backseat.
     17   Q.   Not on Mr. Birch's person.
     18   A.   No.
     19   Q.   The front passenger would also have access to the
     20   backseat, would she not?
     21   A.   Yes.
     22   Q.   Have -- sergeant, have you or law enforcement ever
     23   arrested Mr. Birch carrying a firearm?
     24   A.   No.
     25   Q.   Have you ever seen him possess a firearm?

*Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com*
*for purchase of a complete copy of the transcript.*
Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 21 of 56

```
 1  A.    No, I have not.
 2  Q.    Do you have any recordings of Mr. Birch carrying a
 3  firearm?
 4  A.    No, not to my knowledge.
 5  Q.    When you performed or law enforcement performed the
 6  controlled buys, was that visually recorded?
 7  A.    We -- one of our recording devices has the
 8  capability of recording video and audio.  I would have to
 9  review the recording to see if there is any video.  Lot
10  of times it's not captured just because of the placement
11  of that device.  But the audio is recorded.
12  Q.    You cannot say that there is -- whether it's audio
13  or visual, if it is visual, that it depicts Mr. Birch
14  carrying a firearm; is that right?
15  A.    No.  And there was no report from the informant that
16  he was in possession of a firearm at all during that
17  encounter.
18           MS. JAEGER:  Nothing else, Your Honor.
19           THE COURT:  Thank you, Ms. Jaeger.
20        Ms. Hake?
21                     REDIRECT EXAMINATION
22  BY MS. HAKE:
23  Q.    I just would like to clarify.  So the November 12,
24  2021, incident, two people in the car; is that right?
25  A.    Yes.
```

```
 1   Q.    So who's the passenger?

 2   A.    Susan Lambe-Meyer.

 3   Q.    And who was driving the car?

 4   A.    The defendant, Matt Birch.

 5         MS. HAKE:  Nothing further.

 6         THE COURT:  Thank you, Ms. Hake.

 7      Anything else, Ms. Jaeger?

 8         MS. JAEGER:  No, Your Honor.

 9         THE COURT:  Thank you, sergeant.  You may step

10   down.

11         THE WITNESS:  Thank you.

12         THE COURT:  Ms. Hake, did you have any

13   additional evidence or a proffer you'd like to make this

14   afternoon?

15         MS. HAKE:  No, Your Honor.

16         THE COURT:  Ms. Hake, do you have any evidence

17   or a proffer you'd like to make?

18         MS. JAEGER:  Are you addressing me, Your Honor?

19   You said Miss Hake.

20         THE COURT:  I'm sorry.  I meant Ms. Jaeger.

21   Been a long day here at the courthouse.

22         MS. JAEGER:  We do have one individual to call

23   to the stand, Your Honor.  But before we do that, I have

24   a proposed exhibit that's been labeled as Exhibit A that

25   I would ask to be admitted and placed under seal as well.
```

1                    *    *    *    *

2            (Exhibit A was offered.)

3                    *    *    *    *

4        THE COURT:  I've been wondering about that.

5   It's kind of a large one here.  And I don't think I've

6   received this in advance of the hearing today, so I

7   haven't had a chance to look at it.  But, Ms. Hake, have

8   you had a chance to review it, and do you have any

9   objection to its admission?

10       MS. HAKE:  I have had a chance to review, and I

11  have no objection.

12       THE COURT:  Okay.  Defendant's Exhibit A is

13  admitted.

14                   *    *    *    *

15          (Defendant Exhibit A was admitted.)

16                   *    *    *    *

17       THE COURT:  And I know, Ms. Hake, that we set

18  these hearings very soon after the defendant's initial

19  appearance usually because that's how they like it.  They

20  don't want a delay.  It also means that I haven't had

21  time to spend any time reading Exhibit A, and it might be

22  helpful if you could highlight perhaps what it is I'm

23  looking for in here.

24       MS. JAEGER:  I can certainly do that, Your

25  Honor.

Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com
No purchase a complete copy of the transcript.
Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 24 of 56

1           THE COURT:  Let's proceed with that then.

2           MS. JAEGER:  With what's in the exhibit?

3           THE COURT:  Yeah.  If there's something

4 specific that you want me to -- call my attention to.

5           MS. JAEGER:  There's nothing specific as it

6 relates to specific appointments or anything there, Your

7 Honor.  It does provide just nutshell summaries of some

8 of the appointments within the last year that Mr. Birch

9 has undergone.  It also provides a listing of medications

10 in various places.  However, the best summary I guess for

11 lack of a better word is on that first page there with

12 the clinic note of February 8 of 2021.  The first few

13 sentences there describe Mr. Birch's history indicating

14 that he was hospitalized January 4 to January 7 of 2021

15 for acute hypoxic respiratory failure secondary to heart

16 failure with left ventricular ejection fraction of 10 to

17 15 percent as well as acute on chronic pulmonary embolus.

18 He has a history of hypertension, methamphetamine use,

19 and heart failure.  In the fall of 2020 he had a

20 hospitalization for acute encephalopathy.

21     So, Your Honor, I'm not any kind of medical expert,

22 and I suspect that when I read this this is probably what

23 other people hear when we're talking about legal terms.

24 But I think all that means that Mr. Birch has a very

25 serious history of heart failure with 10 to 15 percent

Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com
to purchase a complete copy of the transcript.
Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 25 of 56

functioning of his heart, and he does have noted history

of hospitalization relating to that.

Mr. Birch indicates to me and it's my understanding

that he has been on the heart transplant list, that he

has heart problems related to his own personal history

but also a family history. Of course, when he is in

custody, he can no longer be on a heart transplant list.

So Exhibit A is less about a particular entry as much as

it is documentation of Mr. Birch's heart issues and just

additional background information by way of prescriptions

and things of that nature.

THE COURT: Okay. To the extent that that

constitutes a proffer, Ms. Hake, do you have any

objection to it?

MS. HAKE: No, Your Honor.

THE COURT: All right then. That was helpful.

Thank you, Ms. Jaeger. And you indicated you do have a

witness you wanted to call?

MS. JAEGER: I do, Your Honor. We would call

Kasey Copeland to the stand as a proposed third-party

custodian.

THE COURT: Ms. Copeland, you can come right

through those gates, and you saw where the sergeant was

sitting. Before you sit down, can I ask you to please

raise your right hand.

```
 1              KASEY COPELAND, DEFENDANT'S WITNESS, SWORN
 2             THE COURT:  Now watch your step.  When you're
 3   comfortable, please adjust those -- that microphone so we
 4   can hear you and record you.  Would you please state and
 5   spell your name for us.
 6             THE WITNESS:  Kasey Copeland, K-a-s-e-y
 7   C-o-p-e-l-a-n-d.
 8             THE COURT:  Thank you.
 9        Ms. Jaeger.
10             MS. JAEGER:  Thank you, Your Honor.
11                        DIRECT EXAMINATION
12   BY MS. JAEGER:
13   Q.   Ms. Copeland, could you tell us how it is that you
14   know Mr. Birch?
15   A.   I have children with him.
16   Q.   Make sure you speak right into that microphone.
17   A.   I have children with him.
18   Q.   How many children do you share with Mr. Birch?
19   A.   Two.
20   Q.   How old are those children?
21   A.   22 and 20.
22   Q.   And where is it that you reside?
23   A.   453 Kaufmann, Dubuque, Iowa.
24   Q.   Is that Kaufmann Avenue?
25   A.   Uh-huh.
```

*Contact Shelly Semmler at 712-233-3840 or ssemmlerreporting@gmail.com*
*to purchase a complete copy of the transcript.*

Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 27 of 56

```
 1    Q.    Yes?
 2    A.    Yes.
 3    Q.    And is that a house or an apartment?
 4    A.    House.
 5    Q.    Is that something that you own or rent?
 6    A.    Own.
 7    Q.    Is there anyone else residing at the house there
 8    with you?
 9    A.    Just me and my son Ashton.
10    Q.    How old is Ashton?
11    A.    18.
12    Q.    Is there any concern about Mr. Birch should he be
13    released to your residence residing in the same home as
14    Ashton?
15    A.    No.
16    Q.    Is it your desire that Mr. Birch be released to your
17    home?
18    A.    Yes.
19    Q.    Now, you and I have talked before about what we're
20    referring to as third-party custodian.  Do you recall
21    that?
22    A.    Yes.
23    Q.    Can you tell the Court what your understanding is of
24    what a third-party custodian means?
25    A.    I understand that if Matt doesn't obey by the
```

*Contact Shelly Semmler at 712-233-3846 or ssemmlerreporting@gmail.com*
*to purchase a complete copy of the transcript.*
Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 28 of 56

```
 1  Court's rules and he uses drugs that I will call the
 2  U.S. -- or United States Probation Office on him, and he
 3  knows that as well.
 4  Q.   So in a nutshell, if Mr. Birch is not following the
 5  Court's rules or doing something that he's supposed to
 6  do, not doing he's supposed to do or not doing
 7  something -- let me start over.
 8       If he's not doing something he's supposed to do or
 9  if he's doing something he's not supposed to do, you
10  would turn him in.
11  A.   I'd absolutely turn him in.
12  Q.   Do you have any hesitation in doing so?
13  A.   Huh-uh.
14  Q.   Is that a no?
15  A.   Yep.
16         THE WITNESS:  I will turn you in, Matt, if you
17  do anything wrong.
18  Q.   Are you working anywhere, Miss Copeland?
19  A.   Yeah, I work at the Telegraph Herald.
20  Q.   Is that the Dubuque newspaper?
21  A.   Yeah.
22  Q.   What is it that you do there?
23  A.   I work in classified sales.
24  Q.   What kind of hours do you work?
25  A.   Monday through Friday from like eight to four or
```

Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 29 of 56

```
1   eight to five, and I work from home.

2   Q.   So you're working full time, but that's from home?

3   A.   Uh-huh.

4   Q.   Is that a yes?

5   A.   Yes.  Sorry.

6   Q.   Are you anticipating that at-home work to continue

7   for the near future?

8   A.   Yes, for, they said, another year.

9   Q.   Is there any concern about being able to fulfill

10  your obligations as a third-party custodian while also

11  maintaining your employment?

12  A.   No.

13  Q.   Do you have any serious mental or physical health

14  issues that would prevent you from serving as a

15  third-party custodian?

16  A.   No.  I just have anxiety.

17  Q.   Is there anything about your anxiety that would get

18  in the way?

19  A.   No.

20  Q.   Is that anxiety controlled?

21  A.   Yes.

22  Q.   Do you have any guns in your home?

23  A.   No.

24  Q.   Do you have any drugs in your home?

25  A.   No.
```

Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com
No purchase a complete copy of the transcript.
Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 30 of 56

```
1   Q.    Do you have any alcohol in your home?
2   A.    No.
3   Q.    If the Court were to release Mr. Birch to your
4   residence and one of the rules is no alcohol whatsoever,
5   is that going to be problematic for you?
6   A.    No, not at all.
7   Q.    Would you tolerate Mr. Birch bringing drugs or
8   alcohol or guns into your residence?
9   A.    No.
10  Q.    One additional part of being a third-party custodian
11  would be allowing probation to randomly appear and check,
12  search the residence.  Do you have any concerns about
13  them doing so?
14  A.    Not at all, no.
15  Q.    Would you get in the way in any way?
16  A.    No.
17  Q.    Would you be compliant with probation?
18  A.    Yes.
19  Q.    Would you be friendly with probation?
20  A.    Yes.
21  Q.    Okay.  Now, you've heard the testimony here today,
22  and you're generally familiar with what the allegations
23  are in this case.  Do any of those issues or allegations
24  cause you to be concerned about serving as a third-party
25  custodian?
```

```
1   A.    No.
2   Q.    Is there any reason at all that you may not be a
3   good third-party custodian or would not be willing to act
4   in that capacity?
5   A.    I think I'm actually the perfect person for him.
6   Q.    Why is that?
7   A.    Because I've been clean of meth for 21 years.  I
8   have a home, safe home.  I have my life in order.
9   Q.    Did you as part of your getting clean process
10  utilize any kind of treatment or NA, AA, anything of that
11  nature?
12  A.    I did NA.
13  Q.    Do you think those kinds of treatment options would
14  be beneficial to Mr. Birch?
15  A.    Yes.
16  Q.    Would you assist him in making --
17  A.    Yes.
18  Q.    -- arrangements to obtain that treatment and get him
19  there?
20  A.    Oh, yeah, yes.
21  Q.    If he refused to do so, would you turn him in for
22  that?
23  A.    Yes.
24  Q.    Is there anything else that the Court should know
25  about you or your residence that would be material to
```

*Contact Shelly Semmler at 712-233-3846 or ssemmlerreporting@gmail.com*
*to purchase a complete copy of the transcript.*
Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 32 of 56

```
1   this issue of detention?
2   A.   No.
3            MS. JAEGER:  No further questions, Your Honor.
4            THE COURT:  Thank you, Ms. Jaeger.
5        Ms. Hake?
6            MS. HAKE:  Thank you, Your Honor.
7                        CROSS-EXAMINATION
8   BY MS. HAKE:
9   Q.   Miss Copeland, good afternoon.
10  A.   Good afternoon.
11  Q.   When did you first meet the defendant?
12  A.   Maybe 25 years ago.
13  Q.   So roughly 1997.  Is that fair to say?
14  A.   I think that's fair.
15  Q.   And you were in a romantic relationship with him?
16  A.   Yes.
17  Q.   For how long?
18  A.   Like five to seven -- five years maybe.  That was a
19  long time ago so . . .
20  Q.   So until roughly 2003?
21  A.   I would say, yeah, two thousand -- maybe like 2002.
22  Q.   Were you living together during that time?
23  A.   At the beginning we were living together, but then
24  he went to jail, and then I got my own apartment, and, I
25  mean, we lived together -- I think it was like three
```

1    years.

2    Q.    So when you say he went to jail, was that for the

3    going armed with intent charge?  Do you recall?

4    A.    I don't really know.

5    Q.    Was it the theft-movable property conviction that

6    happened in 2000?

7    A.    Might have been the going arm.

8    Q.    The going armed --

9    A.    Uh-huh.

10   Q.    From 1998?

11   A.    Yeah.

12   Q.    Okay.  What about the 2001 possession of a

13   controlled substance conviction?  Is that also in the

14   time frame that you were in a relationship?

15   A.    Yeah, but I don't recall that because that was the

16   year that we had our daughter, so that's -- I don't know

17   about that one but . . .

18   Q.    The year you had your daughter, he went to jail for

19   possessing a controlled substance?

20   A.    That -- I don't -- I don't remember him going to

21   jail with Arianna, you know, for controlled substance in

22   2001.  I think it was for the original charge, the going

23   armed or whatever it was.

24   Q.    So you're in a romantic relationship for five to

25   seven years, and then have you stayed in touch since

```
 1   then?
 2   A.   Oh, yeah, yep.
 3   Q.   How so?
 4   A.   On the phone.  He would randomly stop by, and, you
 5   know, the girls lived with me at the time.  And then he
 6   was really good friends with my boyfriend at the time,
 7   and we just always all got along.
 8   Q.   So from -- I'm guessing with the dates here like
 9   everyone.  So from 2002'ish until the present, you stayed
10   in contact --
11   A.   Oh, yeah.
12   Q.   -- with the defendant?
13   A.   Uh-huh.
14   Q.   Is that a yes?
15   A.   Yes.  Sorry.
16   Q.   Have you been friends that whole time?
17   A.   Yes.
18   Q.   Aware of what's going on in his life?
19   A.   Yes.
20   Q.   All of his criminal history?
21   A.   Yes.
22   Q.   Okay.  Sounds like you maybe didn't know about the
23   theft-movable property.  Did you know about his fugitive
24   status in 2008?
25   A.   I didn't know about that one.
```

*Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com*
*No purchase a complete copy of the transcript.*
Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 35 of 56

```
1   Q.   Did you know about the false imprisonment from 2008

2   or the assault causing bodily injury from 2008

3   conviction?

4   A.   Knew about the assault.

5   Q.   What about the false imprisonment?

6   A.   I mean, I seen it on his record when I would pull it

7   up, but I didn't -- I didn't know much.  It was so long

8   ago that, you know, he might have told me, but I don't

9   recall.

10  Q.   What about the operating vehicle while

11  intoxicated -- intoxicated conviction from 2012?  Did you

12  know about that?

13  A.   Yeah, yes.

14  Q.   What about the domestic abuse assault causing bodily

15  injury?  Did you know about that conviction?

16  A.   What year was that?

17  Q.   2012.

18  A.   I did hear something but not much information about

19  it.

20  Q.   Does the fact that he has a domestic abuse assault

21  conviction trouble you with being a third-party

22  custodian?

23  A.   No, no.

24  Q.   What about the interference with official acts

25  conviction from 2015?  Did you know about that?
```

1    A.    Yeah, yes.

2    Q.    What can you tell me about that?

3    A.    Well, I want to say it was one of the times that he

4    got pulled over; right?  I mean, I don't -- he has so

5    many charges on there that I -- on his record that I

6    don't -- I mean, they're like repeated, so I don't know

7    exactly each individual one, but I'm not sure.

8    Q.    So fair to say you know that he's got a lengthy

9    criminal history but not specifics about each and every

10   one.

11   A.    Yes.

12   Q.    You were aware that he used a false identity at the

13   hospital in 2020?

14   A.    Yes.

15   Q.    And you're aware of his history of substance abuse?

16   A.    Yes.

17   Q.    Do you think it's a threat to your sobriety to have

18   somebody with substance abuse issues in your home?

19   A.    No.

20   Q.    Why is that?

21   A.    Because I'm very strong, and I feel like if Matt

22   would have gotten ahold of me like during this time or if

23   I could have had a say over it or he could have came and

24   lived with me at the time he wouldn't be in this

25   situation.

Contact Shelly Semmler at 712-233-3846 or ssemmlerreporting@gmail.com
Reproduced complete legal and transcript.
Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 37 of 56

1    Q.    Are you aware that he might owe back child support?

2    A.    Yes.

3    Q.    Does he owe that to you?

4    A.    Yes, but before he got caught in November, we were

5    working on getting that all taken care of where I was

6    going to the court and having it like zeroed out

7    basically for him.

8    Q.    So you were going to the court having it zeroed out.

9    What do you mean by that?

10   A.    So like I think he owes like 26,000 or something

11   like that, and, you know, since he has a heart condition,

12   I am able to go to the court, and there's a word for it,

13   but basically he wouldn't owe anything other than the

14   Department of Human Services if I got help during those

15   years.

16   Q.    So he owes just you $26,000.

17   A.    Uh-huh.

18   Q.    Do you know if he owes other families --

19   A.    I don't.

20   Q.    -- child support?

21   A.    I don't know.

22   Q.    But just you, $26,000.

23   A.    Yes.

24   Q.    And that has not been zeroed out by the court.

25   A.    No, but if he gets released, it will be.  Like I

Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com
to purchase a complete copy of the transcript.
Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 38 of 56

```
 1  have the paperwork and everything.
 2  Q.   Okay.  But are you the judge?
 3  A.   No, but it's -- I'm like -- I mean, it seemed like
 4  when I talked to the child support they said it's a
 5  pretty simple thing to do.
 6          MS. HAKE:  I have nothing further.
 7          THE COURT:  Thank you, Ms. Hake.
 8      Miss Jaeger?
 9          MS. JAEGER:  Thank you, Your Honor.
10                     REDIRECT EXAMINATION
11  BY MS. JAEGER:
12  Q.   Ms. Copeland, none of the offenses that the
13  government reviewed with you that are reflected in
14  Mr. Birch's criminal history involved you in any way; is
15  that right?  In other words, you didn't participate in
16  any of those crimes.
17  A.   That you guys are talking -- no, I did not
18  participate in any of those crimes.
19  Q.   Okay.  Do any of those crimes or history of problems
20  with the law cause you concern about serving as a
21  third-party custodian?
22  A.   No, they don't.
23  Q.   Now, you mentioned something about if Mr. Birch had
24  gotten ahold of you that maybe you could have helped him?
25  A.   Well, I just feel like when someone's addicted to
```

*Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com*
*to purchase a complete copy of the transcript.*
Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 39 of 56

```
 1   that drug, I feel like -- or one way like he wasn't
 2   trying to listen to me, but I guess if -- had I went to
 3   the hospital originally to pick him up that day, I feel
 4   like I could have had a little bit more to say but . . .
 5   Q.   So -- and correct me if I'm misunderstanding you,
 6   but what I'm hearing you say is that you believe your
 7   sobriety could be of benefit to Mr. Birch --
 8   A.   Very much.
 9   Q.   -- and help him on his path towards sobriety.
10   A.   Very much.
11   Q.   Okay.  Is there anything that you've heard from the
12   testimony today about the instance of these issues that
13   Mr. Birch is facing that cause some concern?
14   A.   No.
15           MS. JAEGER:  Nothing else, Your Honor.
16           THE COURT:  Thank you, Ms. Jaeger.
17       Ms. Hake?
18           MS. HAKE:  Nothing, Your Honor.
19           THE COURT:  Okay.  Thank you, Ms. Copeland.
20   You may step down.
21       Ms. Jaeger, did you have any additional evidence or
22   a proffer you'd like to make this afternoon?
23           MS. JAEGER:  No, Your Honor.  Just argument.
24           THE COURT:  Let's proceed then with those
25   arguments.  Ms. Hake?
```

MS. HAKE: Thank you, Your Honor. The defendant should be detained here. We do have a rebuttable presumption of detention, and the defendant should also be detained when you look at the factors under 18 United States Code section 3142(g).

I'll start with the nature and circumstance of the offense. We've got a pattern of drug-trafficking behavior over multiple years. This is not just a single isolated incident. And the behavior also involves large quantities of methamphetamine.

In addition, the defendant has engaged in dangerous behavior throughout. There are several instances of eluding that Sergeant Williams testified about, attempts to hit officers with vehicles, driving at high speeds near elementary schools, and the fact that multiple people said that he is known to carry firearms and would undergo suicide by cop rather than go back to prison.

He also has extensive history of lying to law enforcement in his criminal history and then also in the instant offense in this case.

The weight of the evidence is strong as testified to by Sergeant Williams.

As for the history and characteristics of the defendant, the government is concerned that he has several children that he is not taking care of. He

*Contact Shelly Semmler at 712-233-3846 or ssemmlerreporting@gmail.com to purchase a complete copy of the transcript.*

admits in his pretrial services report to probation that
he may owe back child support.  In fact, in 2018 when he
had overdue child support and fees -- I'm looking at
paragraph 18 here -- he actively tried to avoid paying.
And this is before some of those medical problems that
seem to have popped up most recently.

Even though he owes back child support -- we just
heard testimony that it's $26,000 just to one mother --
he's not been engaged in a legitimate job or keeping up
with those obligations.  He's been unemployed for two
years, no net worth, no monthly cash flow.  He's just
drug dealing.

I'll also note that he used a false identity because
he knew he had active warrants out, and that's multiple
times.  It's at the hospital.  It's in September of 2021
during a traffic stop.

The defendant also has serious substance abuse
issues most notably involving methamphetamine which is at
issue with the instant offense here.  And he's not been
able to maintain sobriety even after getting treatments.

And we appreciate the testimony from Miss Copeland
today about how perhaps she could help the defendant
maintain sobriety.  But the fact is he's undergone
several treatments, and they have not been successful.

The defendant also has a notable criminal history,

several involving violence.  There's the assault causing
bodily injury and false imprisonment, going armed with
intent, and then the domestic abuse assault causing
bodily injury and mental illness and harassment.  He's
got a couple substance abuse-related convictions,
possessing a controlled substance, OWI, and, of course,
the fugitive status as well.

That takes us to his conduct on past release which
has been poor, several probation violations, issues with
methamphetamine, issues with not showing up.  There are
multiple failures to appear.  He absconded from pretrial
supervision.  There's a pattern of him continuing to get
arrested for new offenses while he's still under
supervision.

And although the government understands that he's
concerned about his medical issues and potential
treatment options, the prison system does have medical
care that can take care of the defendant.

If the Court is thinking about release,
Miss Copeland is not an appropriate custodian in this
case.  The government appreciates that she came here and
she testified today, but she's known the defendant for a
very long time.  They have two adult children together.
She's aware of his criminal history, that he used a false
identity.  She's known about his illegal drugs, and she

Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com
No purchase a complete copy of the transcript.
Case 2:22-cr-01002-LTS-MAR  Document 20  Filed 04/14/22  Page 43 of 56

     1    has not been -- even with their longstanding
     2    relationship, she's not been able to help him stop his
     3    criminal activity or his substance abuse issues even
     4    though they are in frequent contact.  And she's willing
     5    to help him get out of those child support obligations.
     6    The government is also concerned about her sobriety if
     7    the defendant were to go to her house.
     8         So all in all, there is no condition or combination
     9    of conditions that would reasonably assure the appearance
    10    of the defendant and the safety of the community, and so
    11    the government requests detention.
    12              THE COURT:  Thank you, Ms. Hake.
    13         Ms. Jaeger?
    14              MS. JAEGER:  Thank you, Your Honor.  We agree
    15    this is a presumption case.  However, we believe that the
    16    evidence and testimony is such that we have rebutted that
    17    presumption and request the Court release Mr. Birch with
    18    conditions as supervised by probation office.
    19         Let me start with one issue that the government has
    20    indicated.  The government made note of Mr. Birch having
    21    several children and I believe they commented to the
    22    effect of that he's not taking care of.  As a first
    23    issue, that is not an appropriate consideration as to
    24    either flight or dangerousness.  That does not relate to
    25    either of those instances.

*Contact Shelly Semmler at 712-233-3846 or ssemmlerreporting@gmail.com*
*No purchase a complete copy of this transcript.*
Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 44 of 56

1    Also, although Mr. Birch's medical treatment may be

2  treated by the Bureau of Prisons, at this stage in the

3  case, he has not yet been found guilty of anything.  He

4  is still an innocent person.  He's not in the custody of

5  the Bureau of Prisons.  So the BOP may have in the future

6  an opportunity to provide care for Mr. Birch.  However,

7  at this point it is Linn County that would be responsible

8  for providing care to Mr. Birch, and Linn County doesn't

9  have the kind of medical treatment opportunities or

10  resources that the BOP does.

11    The community, however, does have the best treatment

12  options for Mr. Birch, and the University of Iowa is

13  close by, and it is the facility for which Mr. Birch has

14  already established care.  They are in the best position

15  to provide care to Mr. Birch.

16    His medical conditions are significant.  He does

17  have a heart failure condition and a serious prognosis in

18  the future.  He has a serious history as reflected by our

19  Exhibit A, and so it is not just a matter of whether

20  treatment's available, but it's also a matter of who can

21  provide treatment, who can provide this kind of treatment

22  because this is not just the common cold.  This is

23  high-level treatment that would be required as well as

24  the amount of money and resources that would be spent in

25  providing this treatment.  It is far better for Mr. Birch

*Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com*
*to purchase a complete copy of the transcript.*

Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 45 of 56

```
 1   to be responsible for those costs than for the taxpayers.

 2       Relating to two issues --

 3           THE COURT:  Is that the case that Mr. Birch has

 4   been insured or paying for these himself?  He's not been

 5   employed.  My guess is -- and at this point it is just a

 6   guess, and I'm sorry to interrupt you, Ms. Jaeger, but

 7   presumably the defendant is receiving assistance for the

 8   medical treatment he's getting anyway.

 9           MS. JAEGER:  He reports, Your Honor, that it is

10   state insurance.  I don't know if that is --

11           THE COURT:  Okay.

12           MS. JAEGER:  -- through state assistance, but

13   it is --

14           THE COURT:  It's not the most important thing,

15   but it just raises a concern, and I apologize for

16   interrupting.  And I'll let you continue.

17           MS. JAEGER:  Not at all, Your Honor.  That is a

18   good concern.  However, it would not just be -- even if

19   we assume it's state assistance through taxpayers as

20   opposed to like a different kind of cheaper insurance

21   program, even under that scenario, that would not account

22   for the marshals' time and their transports back and

23   forth as well as the additional resources by Linn County

24   that they would have to implement for taking care of

25   Mr. Birch, transporting, doing custody exchanges and so
```

Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com
Reproduction of this transcript is prohibited without authorization.

Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 46 of 56

 1   on and so forth, just the extra time and energy in having

 2   to keep a closer eye on him.

 3        And if he is having to go -- I don't know that Linn

 4   County would need to do this, but should they have to

 5   provide a higher level of heightened care to him that

 6   would require additional supervision, that typically

 7   means lockdown type of scenarios.  That's not best for

 8   Linn County or for Mr. Birch.

 9        As it relates to flight, there are certainly issues

10   in Mr. Birch's history.  We're not trying to shy away

11   from any of that.  But, of course, we have additional

12   conditions that can account for those issues, things like

13   our very capable probation office which is very different

14   from the state supervision that someone receives for

15   charge like eluding.  There is no pretrial state

16   supervision for misdemeanor offenses like we do in these

17   kinds of cases.

18        And also we have a third-party custodian who knows

19   Mr. Birch, knows his history, knows what it's like to be

20   in the situation that Mr. Birch has been in and has found

21   himself in as it relates to drug use and is ready,

22   willing, able to serve in that capacity, is working from

23   home and so would be in a unique position to maintain her

24   employment but also be able to serve as a third-party

25   custodian and provide the benefit of a support system

*Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com*
*Reproduction of complete transcript.*
Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 47 of 56

from someone who is now sober and has been sober for a
long time.  That person can provide like sponsor-type
support system and help Mr. Birch get to treatment where
he can further that on his path towards sobriety and
continued long-term sobriety.

He does have a residential history that is all Iowa.
He's 41 now.  He's always lived his entire life in either
Dubuque or in Jackson County.  His family's all in Iowa.
His immediate family's in Dubuque.  Children and the
coparents are all in Iowa.  He has never traveled abroad.
He has no passport.

His medical treatment is at the University of Iowa
so is close by here.  His history of employment, when he
was able to work and not suffering from the medical
conditions that he has now which prevent him from having
long-term employment, that's always been Iowa.  And,
quite frankly, given his medical condition, he's too
frail to try to get on a plane and jump bond or something
of that nature, nor is he particularly dangerous as a
result as well.

This conviction history that we see in the pretrial
services report, although not the shortest that I've ever
seen in my life, it's also not the longest, but it is
also reflective largely of offenses that we know go along
with drug use.  There is not a long history of violent

Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com
Reproduction is complete without transcript.
Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 48 of 56

offenses or particularly violent offenses.  So we believe
that there are sufficient conditions that can be met
through the probation office including the third-party
custodian.  We have rebutted the presumption and ask for
the Court to release Mr. Birch to the third-party
custodian with extensive conditions.

THE COURT:  Thank you, Ms. Jaeger.

Mr. Birch, I'll probably address most of my remarks
to you.  That doesn't mean we're going to have a
back-and-forth.  The testimony's already in, and I'm
reasonably sure that Ms. Jaeger would caution you that
she doesn't want you to say anything at this stage of the
proceedings.

The reason that I make my remarks to you is that I
know the lawyers here are experts on how this all works,
but I can appreciate why it might be new and different to
someone in your position.

One thing that I'm sure is obvious is that this
isn't your jury trial because we don't have a jury with
us today.  I think it's worth pointing out, though, that
if you do go ahead and have a trial on these charges that
the jury's never going to hear anything I have to say
about the strength of the evidence or whether you present
a risk of nonappearance or a danger to the community.
That's because you remain innocent until proven guilty.

 1  I just think it's important to keep that in mind because
 2  my only job is to determine whether you need to be
 3  detained pending that trial.
 4      You probably heard the lawyers talk about the fact
 5  that this is a rebuttable presumption case, and I've
 6  struggled over the years to explain what that might mean
 7  to people who aren't lawyers.  It just means that because
 8  of what you're charged with -- here it's a drug offense
 9  punishable by a long prison sentence -- that the
10  government has a bit of a head start.  And they -- I'm
11  supposed to presume that you should be detained.
12      I think at least in this case the defendant has
13  rebutted the presumption.  He is a long-time resident of
14  the community.  He does have family ties and friend ties
15  to the community.
16      I disagree with Ms. Hake about the suitability of
17  the proposed third-party custodian.  I'm sure that you're
18  grateful to have a friend like her backing you up.  I
19  think someone who has maintained their sobriety for 21
20  years would be someone who would be appropriate if we get
21  to that point.
22      We're not at that point yet because even though the
23  presumption has been rebutted, I do need to consider all
24  the factors to determine whether the government has met
25  its burden of proof.

Contact Shelly Semmler at 712-233-3846 or ssemmlerreporting@gmail.com
Reproduced as a complete copy of the transcript
Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 50 of 56

1    The first factor I need to consider is the nature

2 and circumstances of the offense charged including

3 whether the crime involved violence or a firearm.  And

4 I'm glad to say it doesn't involve violence or a firearm,

5 although there's some mention of firearms somewhat on the

6 periphery of this.  But it's still a very serious offense

7 given the amount of methamphetamine and the length of

8 time that you've been trafficking.  You of all people as

9 someone with a substance abuse problem with

10 methamphetamine knows just how addictive it is and how it

11 is harmful to people who take it and to their families.

12 So I find the nature and circumstances of the offense

13 charged to be very serious, and that is a factor that

14 weighs against you.

15    In terms of the weight of the evidence, there are

16 controlled buys in this case, Mr. Birch, and you can see

17 why that would be strong evidence against you.  Again, I

18 won't be the finder of fact at your trial, but in my view

19 the weight of the evidence is strongly against you.

20    Turning to your history and characteristics, as I

21 said, you do have family ties to the community which are

22 very strong.  In terms of the child support, I assume the

23 reason that Miss Hake brought up the fact that you

24 haven't been paying child support isn't that you ought to

25 be put in jail because you're not paying child support,

```
1   but rather that does tend to affect somewhat the strength
2   of your ties to the community.  I'm sure if you were
3   gainfully employed and you were supporting minor children
4   or something Ms. Jaeger would be telling me that under
5   those circumstances that that's a strong tie to the
6   community which means that I should release you.
7        So I just consider it for that purpose.  That at
8   least somewhat diminishes your ties to the community, but
9   that's not the most important factor in my mind today.
10       You don't have a job.  And that may be most recently
11  because of your health condition.  You have, however,
12  been it seems supporting yourself through the drug trade.
13       Turning to your past conduct including your criminal
14  history and drug and alcohol abuse, I've often said here
15  that it's not my job to put people in jail because they
16  have a substance abuse problem.  I certainly wouldn't
17  want to do that, but I do have to consider the effect of
18  substance abuse on, you know, the likelihood you'll
19  follow the terms and conditions I impose and also the
20  impact on our community.
21       And there's a lot of reason here for me to think
22  that despite Ms. Copeland's best effort to see that you
23  got some treatment that you are a inveterate user of
24  controlled substances, methamphetamine, despite many
25  attempts at treatment.
```

Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com
No purchase or complete copy of this transcript.
Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 52 of 56

```
 1        I know your health condition is serious, at least
 2   from what I've been able to learn about it briefly in our
 3   hearing this afternoon.  I think this might be a somewhat
 4   rare case that I'm not sure you would be that much safer
 5   in terms of your health condition if I were to release
 6   you.  You continued to use methamphetamine despite your
 7   health conditions.  You went to a hospital, and rather
 8   than being truthful with the medical personnel about your
 9   identity, you gave them your brother's identity, and you
10   screwed up the records at least about what medications
11   you should receive.
12        So I'm not pretending by any stretch that putting
13   you in jail, if that's what I decide, is something you
14   should thank me for, but, on the other hand, you
15   presented a danger to yourself under your current status.
16        You also present a danger to the community.  Your
17   multiple attempts to elude law enforcement, these aren't
18   just instances of you hiding from them and on one
19   occasion then them finding you.  But speeding through
20   city streets, speeding past elementary schools, going up
21   on sidewalks, driving on country roads in such conditions
22   that even law enforcement thought it was too unsafe to
23   continue chasing because of the danger that that posed to
24   people, all of those tell me that you could present a
25   real danger to the community if you were to be released.
```

*Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com*
*Reproduction of complete transcript prohibited*

Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 53 of 56

1     Your criminal history may not be as -- the long --

2  the most lengthy that Ms. Jaeger has seen, but it is

3  fairly long, and it is quite troubling.  There are

4  instances of violence, going armed with intent.  You had

5  your probation revoked.  You continued to get charges

6  while you were under supervision or while other charges

7  were pending.  There's a false imprisonment and assault

8  causing bodily injury.  You performed poorly on

9  supervision in that offense.  I'm referring to the one at

10  paragraph 9 of the report.  There's a domestic abuse in

11  2012.  There's a failure to appear as recently as 2018,

12  paragraph 18.

13     I think unfortunately, Mr. Birch, except for the

14  tight support group that has been demonstrated through

15  the testimony of Miss Copeland, you've checked most of

16  the boxes in terms of reasons why detention is

17  appropriate in this case.

18     Based on the totality of the evidence before me, I

19  find that the government has carried its burden of

20  showing by a preponderance of the evidence that the

21  defendant poses a risk of nonappearance and by clear and

22  convincing evidence that he poses a danger to the

23  community.  I conclude there is no condition or

24  combination of conditions I could impose with which the

25  defendant would comply and appear as required at trial

Contact Shelly Semmler at 712-233-3846 or ssemmlerreporting@gmail.com
This is a complete copy of the transcript.
Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 54 of 56

       1    and hearings in this matter and that would ensure the
       2    safety of the community.
       3         I, therefore, order the defendant be committed to
       4    the custody of the attorney general of the United States
       5    until trial in this matter.
       6         And, Mr. Birch, you don't have to agree with my
       7    decision here today.  In fact, you have the right to
       8    appeal this to Chief Judge Strand who's been assigned to
       9    this case.  You have 14 days to appeal that decision if
      10    you discuss that with Ms. Jaeger and the two of you
      11    decide that's a good idea.  Do you understand your right
      12    to appeal my decision?
      13              THE DEFENDANT:  Yes, Your Honor.
      14              THE COURT:  Is there anything further on behalf
      15    of the United States?
      16              MS. HAKE:  No, Your Honor.  Thank you.
      17              THE COURT:  Anything further on behalf of the
      18    defendant?
      19              MS. JAEGER:  No, Your Honor.  Thank you.
      20              THE COURT:  Thank you all.  That will conclude
      21    our hearing.
      22              (The foregoing hearing was
      23              concluded at 2:05 p.m.)
      24                          *  *  *  *
      25    (This concludes the transcript of the audio recording.)

1          CERTIFICATE

2          I certify that the foregoing is a correct

3     transcript to the best of my ability from the digital

4     recording of proceedings in the above-entitled matter.

5          <u>S/Shelly Semmler</u>          <u>4-12-22</u>
           Shelly Semmler, RDR, CRR          Date

6

7                    **INDEX**

8     **WITNESS**:                                    **PAGE**:

9        ADAM WILLIAMS
           DIRECT EXAMINATION                    3
10         BY MS. HAKE
           CROSS-EXAMINATION                     13
11         BY MS. JAEGER
           REDIRECT EXAMINATION                  22
12         BY MS. HAKE
        KASEY COPELAND
13         DIRECT EXAMINATION                    27
           BY MS. JAEGER
14         CROSS-EXAMINATION                     33
           BY MS. HAKE
15         REDIRECT EXAMINATION                  39
           BY MS. JAEGER

16                      * * * * *

17

18    **EXHIBIT**:                                   **PAGE**:

        A                                       24
19
                        * * * * *
20

21

22

23

24

25

*Contact Shelly Semmler at 712-233-3840 or ssemmlerreporting@gmail.com*
*Unofficial non-complete copy of trial transcript.*
Case 2:22-cr-01002-LTS-MAR   Document 20   Filed 04/14/22   Page 56 of 56