UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) Case No. 22-cr-1002 |
| vs. | ) **DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR VARIANCE** |
| MATTHEW DANIEL BIRCH, | ) |
| Defendant. | ) |

COMES NOW Defendant Matthew Daniel Birch, by and through his attorneys, Andrea D. Jaeger of Keegan, Tindal, & Jaeger, and for his Sentencing Memorandum and Request for Variance addressing the factors to be considered in imposing Defendant's sentence under 18 U.S.C. § 3553(a), states as follows:

### A. WITNESSES AND EXHIBITS

1. Defendant does not anticipate calling witnesses.

2. Defendant does not anticipate exhibits beyond filed letters of support and medical records.

### B. OBJECTIONS TO THE PSR AND GUIDELINES ISSUES

3. Defendant withdraws his objections to the base offense level and drug quantity calculations.

4. Defendant persists in his objection to inclusion of Paragraphs 28–32, "Offense Behavior Not Part of Relevant Conduct" or the accuracy thereof. This objection does not affect the calculation of the USSG.

## C. APPLICATION OF THE METHAMPHETAMINE GUIDELINE RESULTS IN AN UNDULY HARSH SENTENCE

5. As this Court is well aware, the Court can sentence below the Guidelines based solely upon policy disagreements with the Guidelines. *See e.g. Spears v. U.S.*, 555 U.S. 261, 263–67 (2009) (*per curiam*); *U.S. v. Kimbrough*, 552 U.S. 85, 109–110 (2007). "In Kimbrough the Supreme Court held that it is not an abuse of discretion for a district court to vary from the Guidelines based on its policy disagreement concerning the disparity between crack and powder cocaine sentences." *U.S. v. Battiest*, 553 F.3d 1132, 1137 (8th Cir. 2009). The United States Supreme Court has permitted trial courts to reject the guidelines on categorical policy grounds. Stated differently, there is no need for the sentencing court to make an individualized determination an excessive sentence is yielded in a particular case. *U.S. v. Beiermann*, 599 F.Supp. 2d 1087 (citing *Spears*, 555 U.S. at 262). Here, the sentence recommended, based upon drug quantity and purity, is disproportionally driven by lab tests indicating the meth in this case qualifies as ice methamphetamine. However, reliance on the ice methamphetamine table results in an unduly harsh sentence, premised upon the Commission's flawed decision to base sentences upon the touchstone of purity. There is no empirical evidence or data to support the Commission's decision to correlate the length of a guideline sentence to the purity of methamphetamine involved in any given case. *U.S. v. Hubel*, 625 F.Supp.2d 845, 843 (2008); *See also U.S. v. Ysidro Diaz*, No. 11-CR-008221-2(JG), 2013, WL 322243 (E.D.N.Y. January 28, 2013). Therefore, a variance is warranted.

6. Here, application of the methamphetamine mixture guidelines to all methamphetamine, and not any ice methamphetamine guidelines, would result in a reduction of 4-levels, a difference of at least 51–63 months. The addition of approximately 4.25–5.25 years or

more punishment based upon solely the attribution of "ice" v. "mixture" is neither warranted by the allegations in this case nor by comparison to similar offenders.

A. *History of Methamphetamine Guidelines*

19. Initially, the Sentencing Guidelines treated one gram of meth as the equivalent of two grams of cocaine or 0.4 grams of heroin. *See* United States Sentencing Commission, *Methamphetamine Final Report 1999*, pages 7–13, available at https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=0ahUKEwizjsOClPzRAhUMlJQKHQvhBVgQFggaMAA&url=http%3A%2F%2Fwww.ussc.gov%2Fsites%2Fdefault%2Ffiles%2Fpdf%2Fresearch%2Fworking-group-reports%2Fdrugs%2F199911_Meth_Report.pdf&usg=AFQjCNGpVaVBJLQwCHqZ-cU9UL0q2SH8Fg&sig2=jONc1u_IQaW31H09K5ud-w&bvm=bv.146094739,d.cGw&cad=rja. In theory, this was a value judgment one gram of meth was twice as dangerous as cocaine, but only 4/10 as harmful as the same weight of heroin. Over years of persistent upward directives, meth punishments increased 5,000% relative to these other serious drugs.[1] One gram of meth (actual) is now considered the equivalent of 100 grams of cocaine or 20 grams of heroin. *See* USSG § 2D1.1 App. Note 8(D)—Equivalency table. However, studies show heroin and cocaine users are 400% and 160%, respectively, more likely to require an emergency room visit than comparable methamphetamine users. Dr. Paul Hofer, *Ranking Drug Harms for Sentencing Policy*, Johns Hopkins Department of Psychological and Brain Sciences (May 2015), page 15, available online at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2612654. Nevertheless, these ratios

---

[1] Calculated as: (1 gram meth/2 grams cocaine)/(1 gram meth/100 grams cocaine)=50*100=5,000% and (1 gram meth/0.4 grams heroin)/(1 gram meth/20 grams heroin)=50*100=5,000%

remain in effect, despite not having a founded basis for such significantly harsher punishment of ice compared to other drugs.[2]

| Drug: 50 grams | Base offense level | USSG range at criminal history category VI |
|---|---|---|
| Ice | 27 | 130–162 |
| Meth mixture | 21 | 77–96 |
| Cocaine base (crack) | 21 | 77–96 |
| Fentanyl | 21 | 77–96 |
| Heroin | 15 | 41–51 |
| Cocaine powder | 12 | 30–37 |
| Marijuana | 6 | 12–18 |

This upward trend in methamphetamine punishments is based upon two flawed justifications.

  B. *Meth Actual is Not More Dangerous than Meth Mixture*

  20. First, in the late 1980's, Congress formed a mistaken belief crystalline drugs, such as crack and meth (actual), are much more addictive and dangerous than the chemically-identical powder forms. United States Sentencing Commission, *Methamphetamine Final Report 1999*, pages 7–13, available at https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=0ahUKEwizjsOClPzRAhUMlJQKHQvhBVgQFggaMAA&url=http%3A%2F%2Fwww.ussc.gov%2Fsites%2Fdefault%2Ffiles%2Fpdf%2Fresearch%2Fworking-group-reports%2Fdrugs%2F199911_Meth_Report.pdf&usg=AFQjCNGpVaVBJLQwCHqZ-

---

[2] The disparate treatment of ice methamphetamine compared to, for example, fentanyl, is particularly striking.

cU9UL0q2SH8Fg&sig2=jONc1u_IQaW31H09K5ud-w&bvm=bv.146094739,d.cGw&cad=rja.

This belief meth (actual) is worse than meth (mixture) was determined to be incorrect. By 1999, the Sentencing Commission had already determined and reported to Congress: "Methamphetamine-mix and Methamphetamine-actual are not readily distinguishable, requiring a laboratory analysis to determine the purity of the drug," *id.* at 15, and "Methamphetamine-Actual and –mix are not different forms of substance but rather are alternative methods of measuring the severity of the offense…." *Id.* at 14, fn. 40.

21. Indeed, although meth in either form is chemically identical, mixing agents are not. Use of meth (actual) is actually *significantly less dangerous* than use of meth (mixture).[3] Approximately ten years ago, the United States and Mexico both greatly restricted the sale of pseudoephedrine, resulting in a shift from home-made meth to laboratory-made meth. Combat Methamphetamine Epidemic Act of 2005, Pub. L. No. 109-177, tit. VII, 120 Stat. 256 (2006); James J. Cunningham et al., *Mexico's Precursor Chemical Controls: Emergence of Less Potent Types of Methamphetamine in the United States*, 129 Drug & Alcohol Dependence 125, 126 (2013); Nat'l Drug Intelligence Ctr., U.S. Dep't of Justice, Publ'n No. 2010-Q0317- 001, *National Drug Threat Assessment* (2011), *available at* http://www.justice.gov/archive/ndic/pubs44/44849/44849p.pdf. As the availability of home-made methamphetamine fell, the average purity of methamphetamine nationwide rose from about 30% in 1999 to 93% by June 2012. United States Sentencing Commission, *Methamphetamine Final Report 1999*, fn. 33, available at https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=0ahUKEwizjsO

---

[3] Of course, Defendant does not suggest the use of methamphetamine is healthy. However, as is shown, it is a fallacy to conclude meth (actual) is more dangerous than meth (mixture).

ClPzRAhUMlJQKHQvhBVgQFggaMAA&url=http%3A%2F%2Fwww.ussc.gov%2Fsites%2Fdefault%2Ffiles%2Fpdf%2Fresearch%2Fworking-group-reports%2Fdrugs%2F199911_Meth_Report.pdf&usg=AFQjCNGpVaVBJLQwCHqZ-cU9UL0q2SH8Fg&sig2=jONc1u_IQaW31H09K5ud-w&bvm=bv.146094739,d.cGw&cad=rja (1999 statistics). This change toward cleaner and more pure meth meant users experienced *fewer* harmful effects of drug use. A Department of Justice study found as purity levels rose, methamphetamine related emergency department visits over a sample three-year time frame dropped 41.5% and methamphetamine related in-patient treatment admissions dropped 29.9%. Nat'l Drug Intelligence Ctr., U.S. Dep't of Justice, Publ'n No. 2010-Q0317-001, *National Drug Threat Assessment* (2011), *available at* http://www.justice.gov/archive/ndic/pubs44/44849/44849p.pdf.

22. There is no question methamphetamine is a damaging and harmful drug to those who are addicted to it and to society at large. Nothing about this argument is intended to minimize this fact. But is it justifiable to treat methamphetamine so much more severely than other types of hard drugs? Is it justified particularly when the more likely source of the persistent increases to sentences for methamphetamine is largely political pressures rather than substantive rationale? Defendant respectfully asserts it is not, particularly in this case where there are no other aggravating circumstances, based solely upon the alleged differences between ice and mixture methamphetamine, not present in every methamphetamine case.

C. *Possession of Highly Pure Methamphetamine Does Not Indicate a Prominent Role*

23. Second, Congress erroneously assumed "a defendant [who] is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs." USSG §2D1.1 cmt. n.27(c). This assumption also required a second

assumption each successive layer of middle man would dilute the meth in order to increase the quantity for resale, resulting in increasingly diluted drugs as the drugs journeyed to the eventual end user. This has never been shown to be correct. Indeed, as noted above, across the United States and across all levels, seized methamphetamine averages 93% purity. This means the average meth bought by a user on the streets incorrectly paints her as a presumptive kingpin.

24. Furthermore, as purity climbed, price plummeted 377% between October 2007 and June 2012, from $306.49 per gram to only $81.28 per gram. DEA Intelligence Division Report chart at p. 16, available at https://www.drugabuse.gov/sites/default/files/files/cewg_january_2013_vol1_508.pdf. When the average purity of methamphetamine is 93%, and all meth over 80% purity is considered "actual," focusing on meth purity fails to distinguish culpability among drug distributors.

25. Because reliance on the meth (actual) table results in an unduly harsh sentence and is not supported by empirical data, a variance is warranted. In 2013, the Honorable Mark W. Bennett, District Judge for the Northern District of Iowa, wrote an exhaustive opinion tracing the history of the methamphetamine guidelines and outlining his rationales for having a policy disagreement with the ice methamphetamine guidelines. *See U.S. v. Hayes*, 948 F.Supp.2d 1009 (N.D. Iowa 2013). Judge Bennett has not been alone on this issue. *See, e.g.*, *U.S. v. Santillanes*, No. 07-619 (D.N.M. Sept 19, 2009), available on PACER at https://ecf.mmd.uscourt.gov/doc1/12111917143. Defendant respectfully requests the Court vary downward from the advisory USSG range to reflect a policy disagreement, or because application of the USSG results in an unduly harsh sentence, with the use of ice methamphetamine calculations. Defendant respectfully requests he be granted a variance based upon policy disagreement, as stated in *U.S. v. Harry*, 313 F. Supp. 3d 969 (N.D. Iowa June 6, 2018) and *U.S.*

*v. Nawanna*, 2018 WL 2021350 (N.D. Iowa May 1, 2018), or based upon the need to avoid unwarranted sentencing disparities. There is nothing particularly egregious about this case, or the methamphetamine involved, to justify the disparate treatment of Defendant, and this case involving ice, compared to other defendants whose cases involve some portion of mixture methamphetamine. Nor do the circumstances of this offense justify the disparate treatment of ice methamphetamine compared to other "hard" drugs, like crack, cocaine, heroin, or fentanyl.

26. While it may be tempting to respond to this disparity by driving the sentences of other cases upward, rather than lowering the disparities of ice methamphetamine sentences, such would not serve to advance the goals of sentencing, be based upon empirical evidence, or reflect trends in sentencing policies. If drug sentences over the last several decades have taught us anything, it is that continually increasing already lengthy drug sentences fails to curtail the flow or use of controlled substances, does not have the intended deterrent effect, and fails to address concerns about the costs of incarceration, the human toll, institutionalized discrimination, or the oft-underlying addiction and need for substance abuse treatment. *See, e.g.*, Mann, Brian, NPR, *After 50 Years of the War on Drugs, 'What Good Is It Doing For Us?'* (June 17, 2021) available at https://www.npr.org/2021/06/17/1006495476/after-50-years-of-the-war-on-drugs-what-good-is-it-doing-for-us; Jones, Dustin, NPR, *From Marijuana to Mushrooms, Voters Want Drug Laws Eased* (Nov. 4, 2020) available at https://www.npr.org/2020/11/04/931507602/from-marijuana-to-mushrooms-voters-want-drug-laws-eased; Morhaim, Dan, Baltimore Sun, *The war on drugs has not only failed, it's worsened drug use in America (commentary)* (Mar. 8, 2021) available at https://www.baltimoresun.com/opinion/op-ed/bs-ed-op-0309-crw-morhaim-drug-war-20210308-3o7ulj6d3jelfmkxv5ftz6r3uu-story.html; NPR, *Research Finds Racial Disparities in Prison Sentences* (Nov. 25, 2017) available at https://www.npr.org/2017/11/25/566438860/research-

finds-racial-disparities-in-prison-sentences; *see also, generally* H.R. 1693-Equal Act of 2021 (proposal to eliminate disparity between crack and coke) available at https://www.congress.gov/bill/117th-congress/house-bill/1693?s=1&r=47.

### D. DEFENDANT'S CHARACTERISTICS AND "NEEDS" OF THE SENTENCE IMPOSED

27. Defendant respectfully requests the Court vary downward and suggests lengthy incarceration is not necessary to promote respect for the law, to afford adequate deterrence, or to protect the public. 18 U.S.C. § 3553(a)(2)(A)–(C). While Defendant admits his conduct and accepts responsibility for the same, the circumstances of the offense and of Defendant's background illustrate Defendant's behaviors and criminal history is largely driven by his own drug addiction and need for additional treatment. That is, Defendant's circumstances and the circumstances of his offense suggest Defendant's conduct is born out of addiction, and not pure propensity to criminality, and therefore amenable to rehabilitation. Indeed, Defendant is safety valve eligible, PSR ¶ 19, a sentencing consideration reserved only for those offenders for whom special consideration is granted based on their amenability to rehabilitation and lack of aggravated background. Additionally, it is clear Defendant has a need for substance abuse treatment, as his addiction to methamphetamine has largely gone unchecked for almost three decades and has resulted in "catastrophic consequences," including negatively affecting his mental and physical health and requiring medical intervention and admission. PSR ¶¶ 89, 93–95. Notably, however, Defendant does not appear to have other serious substance abuse needs, giving hope for the likelihood of success of additional future treatment. Defendant has a history of substance abuse treatment, PSR ¶¶ 92–95, and is desirous of additional treatment; put simply, the more resources and tools Defendant can utilize, the better. While Defendant acknowledges his first step will be at

the BOP, rehabilitation is possible and should be a primary goal in determining an appropriate disposition. 18 U.S.C. § 3553(a)(2)(B)–(C).

28. Also noteworthy is Defendant's serious physical health conditions. It is clear Defendant's physical health is of great concern, and Defendant respectfully suggests his usually severe physical health conditions warrant a significant downward variance. Defendant's history includes blood clots in his lungs, high blood pressure, arrhythmia, stage 2 kidney failure, and congestive heart failure. PSR ¶ 74; *see also* CM/ECF Nos. 55–56. These conditions are severe:

   a. January 2021: A CT angiogram displayed a left lower lobe pulmonary embolism in wedge-shaped hypoperfusion, mild diffuse cardiomegaly with biatrial enlargement, lower lobe pulmonary artery branches slightly limited on the ride side, mild peribronchial thickening in the right lower lobe with no bronchial secretions, and non-obstructing right renal stone. An echocardiogram which displayed an enlarged left ventricle, severely decreased left ventricular systolic function, mildly enlarged right ventricular size, decreased right ventricular systolic function, severe biatrial enlargement, right to left shunt, mild mitral regurgitation, mile tricuspid regurgitation, and pulmonary artery systolic pressure was elevated. Defendant was diagnosed with acute heart failure with reduced ejection fraction, prolonged Q-T interval, pulmonary embolism and infarction, stage 2 kidney disease, hypertension, shortness of breath, and elevated d-dimer. Principal diagnosis of acute hypoxic respiratory failure
   b. November 2021: chest x-ray which displayed that the heart size and pulmonary vascularity were normal given technique, no acute pulmonary or pleural abnormalities were seen, and there were no acute fractures. The defendant underwent an electrocardiogram (EKG) which displayed sinus tachycardia, left atrial enlargement, low voltage in the precordial leads, anteroseptal infarct (old), and borderline T abnormalities inferior leads.
   c. March 2022: examined for heart failure after he reported having chest pain. He underwent chest x-rays with no acute findings
   d. April 2022: diagnosed with chronic systolic heart failure secondary to nonischemic cardiomyopathy New York Heart Association Class III, Stage C and left ventricular ejection fraction 15%
   e. July 2022: left ventricular ejection fraction had improved to 48%. MRI displayed that the left ventricle was normal in size, mildly decreased systolic function, focal delayed enhancement in the basal lateral wall, the right ventricle was normal in size and global systolic function, and the extracellular volume (ECV) was elevated at 31% suggesting interstitial fibrosis

  f. August 2022: genetic testing, invitae cardiomyopathy comprehensive panel, was positive. A heterozygous pathogenic variant was identified within the DSP gene.
  g. October 2022: defibrillator/pacemaker operation.
  h. Defendant reports he was on the heart transplant list, which has been removed as long as Defendant remains in custody.

PSR ¶¶ 74–81; CM/ECF Nos. 55–56.

29. Complicating, and no doubt negatively impacting, Defendant's physical health are his reported mental health needs, including a history of anxiety, severe depression, antisocial personality disorder, problematic gambling, intermittent suicidal tendencies, and anxiety disorder. PSR ¶¶ 82–86.

30. Yet, there are other positive factors which support a likelihood of successful rehabilitation. Defendant has obtained his GED while in custody, PSR ¶ 96, and he has shown an interest in additional vocational training in several areas, PSR ¶ 97. Defendant also has a history of gainful employment, including long term employment. PSR ¶ 99. And, Defendant has maintained a positive relationship with his family. PSR ¶¶ 65–73. These factors, taken together, suggest a downward variance is appropriate.

### E. CONCLUSION

WHEREFORE Defendant respectfully requests he be sentenced in accordance with the foregoing.

           Respectfully submitted,

           */s/ Andrea D. Jaeger*
           Andrea D. Jaeger
           Keegan, Tindal, and Jaeger
           2322 E. Kimberly Rd., Ste. 140S
           Davenport, IA 52807
           Telephone: (319) 887-6900/563-355-6060
           Facsimile: (319) 688-2754
           Email: andrea@keeganlegal.com

           **ATTORNEYS FOR DEFENDANT**

**Certificate of Service**

The undersigned certifies that the foregoing instrument was electronically filed on April 4, 2023, with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all parties to the above cause and to each of the attorneys of record herein at their respective addresses disclosed on the pleadings.

*/s/ Andrea D. Jaeger*
